UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
:
JOHN L. GALLO, *et al.*, :
: CASE NO. 1:13-CV-02440
Plaintiffs, :
:
vs. : OPINION & ORDER
: [Resolving Doc. No. 8]
MOEN, INC., :
:
Defendant. :
:
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Retirees of Defendant Moen, Inc., a widow of a Moen retirees of Moen, and the United Automobile Workers ("UAW") say that Defendant Moen will cancel their current healthcare coverage.[1] On behalf of a purported class of retirees of Moen and their eligible family members, Plaintiffs move for a preliminary injunction requiring Moen to continue their present healthcare coverage during this lawsuit.[2] For the reasons that follow, the Court **GRANTS** Plaintiffs' motion.

**I. Procedural Background**

On November 1, 2013, Plaintiffs John Gallo, Mary Savage, Theodore Wallace, Thomas Nichols, Donald Weaver, Robert Weitzel, John Girman and the United Automobile Workers sued Defendant Moen, Inc, on behalf of all retirees of Moen who receive healthcare benefits and their eligible family members.[3] Plaintiffs challenge Moen's plan to terminate their existing healthcare

---

[1] Doc. 1.
[2] Doc. 8.
[3] Doc. 1.

-1-

Case No. 1:13-CV-02440
Gwin, J.

benefits.[4] Plaintiffs say that Moen's planned termination of healthcare benefits breaches the collective bargaining agreements and plant closing agreement Moen signed with the UAW. This Court has jurisdiction under § 301 of the Labor Management Relations Act ("LMRA")[5] and under the Employee Retirement Income Security Act ("ERISA") § 502.[6][7]

On November 13, 2013, Plaintiffs moved for a preliminary injunction to prevent Moen from terminating the current healthcare benefits for retirees and their eligible family members.[8] Plaintiffs say that the collective bargaining agreements unambiguously gave vested lifetime healthcare benefits.[9] Plaintiffs also say that the class members will suffer irreparable harm because the class members have only low pension and social security benefits and the cost of getting equivalent coverage is high.[10]

Defendant Moen opposes the motion.[11] Under its reading of the collective bargaining agreements, Moen says that it reserved the right to cancel retirees' healthcare benefits after the collective bargaining agreements ended.[12] Defendant also says that Plaintiffs have not shown irreparable harm because the class members may be eligible for Medicare and Medicaid, other forms of government-subsidized health insurance, or even low-cost private insurance.[13]

On December 11, 2013, the Court held a hearing with testimony from named Plaintiffs John

---

[4] *Id.*
[5] 29 U.S.C. § 185.
[6] 29 U.S.C. § 1132.
[7] Doc. 1 at ¶¶ 66, 76.
[8] Doc. 8.
[9] Doc. 8-1 at 13-20.
[10] *Id.* at 20-22.
[11] Doc. 21.
[12] *Id.* at 6-17.
[13] *Id.* at 17-23.

Case No. 1:13-CV-02440
Gwin, J.

Gallo and Mary Savage and purported class member Melody Wallace and argument by the parties.

## II. Factual Findings

Based on the testimony presented at the hearing and the documents the Court accepted into evidence,[14] the Court makes the following factual findings.

*Collective Bargaining Agreements*

Starting in 1965, the collective bargaining agreements for workers at Defendant Moen's Elyria, Ohio, facility between Defendant Moen[15] and the UAW included giving insurance coverage Moen to its employees and to retirees.[16]

In the first paragraph of the insurance article, Moen "agree[d] to furnish the following described insurance to its employees": life insurance; accidental death and dismemberment insurance; sickness and accident weakly benefits; and hospitalization, surgical, and medical benefits.[17] In this <u>employee</u> benefit provision, Moen reserved "the right to amend, cancel, or reinsure the policies or change the underwriters thereof, so long as the [] benefits are maintained for the life of this Agreement."[18]

In a later paragraph of that same article, the parties agreed that "the term 'Employe [sic]' shall not include part-time employees."[19]

In a separate provision of the collective bargaining agreement, Moen agreed that [c]ontinued

---

[14] The Court accepted into evidence Documents 8-10, 8-11, 8-12, 8-13, 8-14, 8-15, 8-16, 8-17, 8-18, 8-19, 8-20, 8-21, 8-22, and 8-23. The Court also accepted into evidence the letters from Moen attached to Documents 8-2, 8-3, 8-4, 8-7, and 8-8.

[15] Defendant Moen had several predecessor entities. For simplicity, the Court will refer to all of Moen's predecessors and Moen as "Defendant" or "Moen."

[16] Doc. 8-10.

[17] *Id.* at ¶ 157.

[18] *Id.*

[19] *Id.* at ¶ 161.

-3-

Case No. 1:13-CV-02440
Gwin, J.

hospitalization, surgical and medical coverage will be provided without cost to past and future pensioners and their dependents."[20] Unlike the employee benefit provision, this retiree benefit provision contained no language ending the benefit at the end of the collective bargaining agreement.

In the final paragraph of the article, Moen agreed to "pay the monthly premium charge for all insurance provided under this agreement for all employes [sic] and their eligible dependents under the terms of the policy and for all retirees and future retirees (other than those who receive vested rights benefits) and their eligible dependents under the terms of the policy."[21]

Similar language was included in each of the subsequent collective bargaining agreements until 1991.[22] Subsequent collective bargaining agreements changed the benefit levels for future retirees but did not change the benefit levels for employees who had already retired. In 1991, the collective bargaining agreement distinguished between past pensioners, who would receive no-cost healthcare coverage, and future retirees who retired after March 1, 1993, who would have to pay premiums to "be frozen" at the time of retirement.[23] The remainder of the collective bargaining

---

[20] *Id.* at ¶ 162.

[21] *Id.* at ¶ 163.

[22] *See* Docs. 8-11 (1968 agreement) at ¶¶ 157 (defining employee benefits), 161 (defining employee), 162 (defining pensioners benefits), & 163 (requiring payment of premiums for employees and retirees); 8-13 (1971 agreement) at ¶¶ 157 (defining employee benefits), 161 (defining employee), 162 (defining pensioners benefits), & 163 (requiring payment of premiums for employees and retirees); 8-14 (1974 agreement) at ¶¶ 148 (defining employee benefits), 152 (defining employee), 153 (defining pensioners benefits), & 154 (requiring payment of premiums for employees and retirees); 8-15 (1976 agreement) at ¶¶ 148 (defining employee benefits), 152 (defining employee), 153 (defining pensioners benefits), & 154 (requiring payment of premiums for employees and retirees); 8-16 (1980 agreement) at ¶¶ 146 (defining employee benefits), 150 (defining employee), 151 (defining pensioners benefits), & 152 (requiring payment of premiums for employees and retirees); & 8-17 (1987 agreement) at ¶¶ 146 (defining employee benefits), 150 (defining employee), 151 (defining pensioners benefits), & 162 (requiring payment of premiums for employees and retirees).

[23] Doc. 8-19 (1991 agreement) at ¶ 151.

Case No. 1:13-CV-02440
Gwin, J.

agreement contained similar provisions to the previous agreements.[24]

In 1996, the agreement again distinguished between past pensioners—who would receive no-cost healthcare coverage—and future retirees who retired after March 1, 1996—who would only be partially reimbursed for Medicare Part B.[25] The remainder of the collective bargaining agreement contained provisions similar to the previous agreements.[26]

The subsequent agreements followed the 1996 agreement's terms.[27] In 2005, Moen and the UAW agreed on the last collective bargaining agreement.

In 2008, the Elyria facility closed. Moen continued to provide retiree healthcare coverage at the rates required by the 2005 collective bargaining agreement.

On March 18, 2013, however, Moen sent letters to all retirees and their eligible dependents telling them that Moen was ending its current healthcare coverage on December 31, 2013.[28]

For retirees who were Medicare-eligible, Moen would cancel its coverage entirely and stop providing Medicare Part B premium repayments.[29]

For retirees who were not Medicare-eligible, Moen offered to enroll them in Moen's active

---

[24] *See id.* at ¶¶ 146 (defining employee benefits), 150 (defining employee), & 152 (requiring payment of premiums for employees and retirees).

[25] Doc. 8-20 (1996 agreement) at ¶ 131.

[26] *See id.* at ¶¶ 126 (defining employee benefits), 130 (defining employee), & 132 (requiring payment of premiums for employees and retirees).

[27] *See* Docs. 8-21 (1999 agreement) at ¶¶ 126 (defining employee benefits), 130 (defining employee), 131 (defining pensioners benefits), & 132 (requiring payment of premiums for employees and retirees); 8-22 (2002 agreement) at ¶¶ 125 (defining employee benefits), 129 (defining employee), 130 (defining pensioners benefits), & 131 (requiring payment of premiums for employees and retirees); & 8-23 (2005 agreement) at ¶¶ 125 (defining employee benefits), 129 (defining employee), 130 (defining pensioners benefits), & 131 (requiring payment of premiums for employees and retirees).

[28] *See, e.g.*, Doc. 8-2 at 3-4.

[29] *Id.*

Case No. 1:13-CV-02440
Gwin, J.

associate health plan at the monthly premium rate current employees pay.[30]

Moen provided the services of Extend Health, a third-party contractor, to all retirees to determine the right healthcare coverage or Medicare supplement for each.[31]

The Plaintiffs gave evidence regarding certain covered retirees:

*Melody Wallace*

Melody Wallace and her husband, who is a Moen retiree, pay approximately $2000 per year in medical expenses under her present healthcare coverage.[32] This amount includes her co-premium to participate in Moen's coverage for retirees, her partially-subsidized Medicare Part B premium, medical visit co-payments, and prescription co-payments.

Extend Health recommended a Medicare supplemental insurance plan for when Moen's coverage ended. Under the recommended supplemental insurance, and without the current coverage, the Wallaces face expected medical costs of around $12,000 without Moen's present coverage. If Moen takes away the retiree health insurance, the Wallaces must pay roughly $10,000 in additional health care expenses.

The Wallaces have fixed expenses including a mortgage, homeowner's and car insurance, utility payments, and food costs and major, expensive dental work. Their monthly income is $3500.

*Mary Savage*

Mary Savage, a widow of a Moen retiree, and her son presently participate in Moen's

---

[30] Doc. 8-3 at 11-12.
[31] Docs. 8-2 at 4; 8-3 at 12.
[32] The Court finds these facts based on the testimony Melody Wallace gave at the preliminary injunction hearing on December 12, 2013.

Case No. 1:13-CV-02440
Gwin, J.

coverage for retirees.[33/]  Savage is not eligible for Medicare.

Although her son is eligible for healthcare through his new employer, the new Moen healthcare plan will cost Savage the entirety of her $150 per month pension from Moen and will have higher deductibles than her previous coverage.

Savage receives an additional $1200 per month in Social Security benefits; her doctor has told her she cannot work.  Because her house is being foreclosed on, she is moving into an apartment that will cost $600; she does not know how much her utility bills will cost.

*John Gallo*

John Gallo, a Moen retiree, is eligible for Medicare.[34/]

After working for Moen for forty two years, Gallo receives a $700 Moen pension.  He also receives a Medicare subsidy and receives about $1200 per month in Social Security benefits.  Because of his rising expenses, he has taken a part-time job, which pays him a total of $5000 a year.

The cheapest Medicare supplement Gallo was able to find would cost $150 per month (with an additional $30 for a drug card) from AARP.  This plan has higher deductibles and co-payments than his current coverage through Moen.

Gallo pays approximately $600 each month in rent and utilities and pays $200 per month for a car lease.

---

[33/]The Court finds these facts based on the testimony Mary Savage gave at the preliminary injunction hearing on December 12, 2013.

[34/]The Court finds these facts based on the testimony John Gallo gave at the preliminary injunction hearing on December 12, 2013.

Case No. 1:13-CV-02440
Gwin, J.

## II. Legal Standard

In deciding whether to grant injunctive relief under Rule 65, the Court considers four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.[35] "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met."[36] An injunction is an "extraordinary remedy" available only when the circumstances "clearly demand it."[37] "The party seeking the injunction must establish its case by clear and convincing evidence."[38]

## III. Analysis

### A.  Likelihood of Success on the Merits

To prove they have a likelihood of success on the merits on their LMRA and ERISA claims, Plaintiffs must show that they had a vested benefit under the collective bargaining agreements.[39] "To prove this, the plaintiffs must show that the defendant and the union intended to include a right to lifetime benefits when they negotiated the [collective bargaining agreements] at issue."[40]

Whether the parties to a collective bargaining agreement intended to include a right to

---

[35] *Eden Foods, Inc. v. Sebelius*, 733 F.3d 626, 631 (6th Cir. 2013) (citing *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 590-91 (6th Cir. 2012).
[36] *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).
[37] *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)).
[38] *Draudt v. Wooster City School Dist. Bd. of Educ.*, 246 F. Supp. 2d 820, 825 (N.D. Ohio 2003).
[39] *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006).
[40] *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

Case No. 1:13-CV-02440
Gwin, J.

lifetime benefits is a matter of contract interpretation.[41] The Court should first look to the language of the agreement to determine if there is a "clear manifestation of intent" to create vested benefits.[42] The Court must consider the contract as a whole.[43]

*Unambiguous Language*

The 2005 collective bargaining agreement unambiguously vests the healthcare benefits Moen's retirees presently enjoy. Moen agreed to provide "[c]ontinued hospitalization, surgical and medical coverage" "without cost to past pensioners and their dependents prior to March 1, 1996."[44] Moen also agreed to cover employees retiring after March 1, 1996, at a co-premium amount "to be frozen at the co-premium in effect at time of retirement."[45] And Moen agreed that "future retirees as of Jan 99 will be reimbursed for Medicare Part B for employee and spouse at Medicare Part B $45.50/ $91.00."[46]

If Moen wished to reserve the right to cancel benefits after the termination of the collective bargaining agreement, it knew how to do so. In an earlier paragraph, Moen agreed to furnish insurance "for its employees," but reserved "the right to amend, cancel or reinsure the policies or change the underwriters thereof, so long as the [] benefits are maintained for the life of this Agreement."[47] Moen argues that this reservation of rights applies to all rights in the article, including retirees' rights; but that argument loses.

---

[41] *See Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (quoting *Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009)) ("[I]f the healthcare plan was the product of collective bargaining, this Court [] applies 'ordinary principles of contract interpretation.'").
[42] *Int'l Union, UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983).
[43] *Id.*
[44] Doc. 8-23 at ¶ 130C.
[45] *Id.* at ¶ 130D.
[46] *Id.* at ¶ 130E.
[47] *Id.* at ¶ 125(2).

Case No. 1:13-CV-02440
Gwin, J.

Moen's reservation of rights appears in a paragraph that describes the rights granted to "employees." The remainder of the contract reveals that the parties had a specific definition of "employee." The parties agreed that "employees" do not include part time employees.[48] Moen's contract included specific provision for terminating health benefits for employees on layoff.[49] And the parties referred to "employees" and "retirees" as separate categories.[50] When Moen reserved the right to cancel "employee" benefits, it only reserved the right to cancel the benefits of full-time, presently-employed workers, not the benefits of retirees.

The fact that the parties knew how to reserve the right to cancel benefits but did not reserve that right for retirees shows that they did not intend to give Moen the right to cancel or amend benefits for retirees.

Moen also argues that the absence of indefinite language describing retiree benefits shows that there is no intent to provide benefits perpetually. However, "retiree benefits are in a sense 'status' benefits which . . . carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree."[51] The Court may employ this inference "if the context and other available evidence indicate an intent to vest."[52]

Because the context already indicates an intent to vest, the fact that retiree benefits contain no durational language supports the Court's finding that the benefits were "status" benefits that vested in retirees through this *Yard-Man* inference.

---

[48] *Id.* at ¶ 129.
[49] *Id.* at ¶ 128(B)(1).
[50] *Id.* at ¶ 131A.
[51] *Yard-Man*, 716 F.2d at 1482.
[52] *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008) (citing *Yolton*, 435 F.3d at 579).

Case No. 1:13-CV-02440
Gwin, J.

*Extrinsic Evidence*

Even if the language is ambiguous and the Court were to look to extrinsic evidence,[53] the extrinsic evidence supports finding the benefits vested. The conduct of the parties over time shows that the parties believed the benefits to have been vested.

First, Moen continued to offer healthcare benefits to retirees even when there was no collective bargaining agreement in effect after the plant closure. If Moen could cancel the benefits at any time after the collective bargaining agreement ended, a rational for-profit corporation would have stopped providing the benefits immediately to cut out unnecessary costs. Moen's assertion that it gratuitously provided retiree benefits for five years but now wishes to stop is illogic. If Moen is a rational for-profit corporation, it would not have provided unnecessary benefits at great cost unless it believed it was legally obligated to do so.

Second, Moen and the UAW treated retirees differently depending on when they retired. Under the 2005 agreement, those who retired before 1996 received healthcare at no cost.[54] But those who retired in 1996 or later had to pay some amount for their healthcare.[55] Moen, as a rational for-profit corporation, would have no reason to offer some retirees more benefits than it offered to others unless it was legally obligated to do so. The UAW would also have no incentive to seek more benefits for some retirees than others. And unless the benefits were vested, no rational union would bargain to give greater benefits to persons long separated from the collective bargaining unit.

The fact that the parties agreed to treat older retirees differently than younger retirees shows

---

[53] *Yolton*, 435 F.3d at 579.
[54] Doc. 8-23 at ¶ 130C, D.
[55] *Id.*

-11-

Case No. 1:13-CV-02440
Gwin, J.

that the parties believed they had to offer more benefits to the older retirees because those rights had already vested.

Therefore, Plaintiffs have shown that they have a strong likelihood of success on the merits.

**B.     Class Members' Irreparable Injury**

Plaintiffs must show that the class members are likely to suffer certain and immediate injury.[56] Plaintiffs have done so here.

The witnesses who testified at the hearing are retirees living on fixed incomes. The dramatic rise in their healthcare costs—in terms of cost of new coverage, loss of Medicare premium assistance, and increased deductibles and co-payments—will destroy their limited incomes. Therefore, Plaintiffs have shown that the class members have a likelihood of suffering immediate and irreparable injury if they are forced to find new healthcare plans.[57]

Moen argues that there are other healthcare plans that are available that can provide coverage to the class members and even Medicaid coverage is possibly available. Even considering the documents submitted by Moen, the Medicare supplement plans cost nearly twice as much as the Wallaces, for example, paid for their healthcare under the current retiree plan.[58]

Additionally, in order to qualify for Medicaid, there are eligibility requirements that may force a class member to sell property.[59]

---

[56]/*Mich Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

[57]/Because it would be unreasonable and wasteful to bring all class members to testify about their likely injury, the Court accepts the three witnesses who testified as representative of the circumstances affecting all the class members. Moen has not given the Court any reason to doubt that the class members are better off than the witnesses who testified.

[58]/*See, e.g.*, Doc. 21-10 (Medicare supplemental plans estimated to cost $3,860). The Wallaces paid around $2,000 in total healthcare costs.

[59]/*See* Medicaid Eligibility Manual (2013) at 356, *available at* http://emanuals.odjfs.state.oh.us/emanuals/DataImages.srv/emanuals/pdf/pdf_books/MedicaidEligibilityManual.pdf.

-12-

Case No. 1:13-CV-02440
Gwin, J.

Finally, the Court must balance the preliminary injunction factors. When balanced against the strong likelihood of success on the merits, the Court would still find that these two factors support granting a preliminary injunction

## C. Remaining Factors

The remaining factors—harm to others and the public interest—do not sway the Court's decision. Moen has been providing healthcare to its retirees even after the Elyria plant closed in 2008. Requiring Moen to continue to do so does not create any harm that Moen is not presently facing and that Moen did not agree to undertake.

Finally, the public interest supports requiring Moen to continue its healthcare coverage. Moen recommends that the United States should eat the cost of this health care coverage through Medicaid. Under Moen's argument of the public interest, retirees should exhaust the limited assets they have and the United States should pick up the cost through Medicaid or other forms of public healthcare coverage beyond Medicare Part B. Combined with the strong likelihood of success on the merits, the public interest in avoiding unnecessary welfare expenses supports an injunction.

## IV. Conclusion

For these reasons, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction. Moen must continue to provide the same healthcare coverage and the same Medicare Part B premium payments that Moen does currently until the Court directs otherwise. Plaintiffs must provide a bond

Case No. 1:13-CV-02440
Gwin, J.

of $5000.  The injunction will go into effect at the time that Plaintiffs post the bond.

 IT IS SO ORDERED.


Dated: December 17, 2013        s/        *James S. Gwin*
                    JAMES S. GWIN
                    UNITED STATES DISTRICT JUDGE