UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                      :

JOHN L. GALLO *et al.*, Individually and    :
on behalf of all others similarly situated,   :

                                        :        CASE NO. 1:13-CV-02440

             Plaintiffs,        :

                                          :

vs.                                    :        OPINION & ORDER
                                    :        [Resolving Docs. 51, 52, & 57]

MOEN, INC.,                         :

             Defendant.        :

                                          :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiffs are a class of retirees of Defendant Moen, Inc., their spouses, surviving spouses, and eligible dependents[1] and the United Automobile Workers union (the UAW).  Plaintiffs say that Defendant Moen intends to end retirement healthcare benefits.  Plaintiffs also say that the parties have long agreed these retirement benefits would be lifetime benefits that could not be taken away.[2] In response, Moen says that the benefits are not vested lifetime benefits and, therefore, it may terminate the benefits.[3]

Often, courts need decide whether collective bargaining agreements create vested retiree health insurance benefits.  Frequently, the decision is close.  In contrast, the decision is easy in this case.   The collective bargaining agreement language; the collective bargaining agreement negotiations; the defendant's statements during collective bargaining; and the parties' long history of not changing retiree health insurance benefits even while reducing current employee benefits

---

[1] Doc. 42 at 4.
[2] Doc. 1.
[3] Doc. 52 at 1-2.

Case No. 1:13-CV-02440
Gwin, J.

show that the parties intended to vest retirees' right to the health insurance benefits. Perhaps even more important, Moen agreed to a shut down agreement with the union that agreed that retirees would continue even though the union would no longer have a collective bargaining agreement with Moen.

In an effort to overcome all these indications that the parties intended to vest retiree right to health insurance, Moen says its collective bargaining agreements included a reservation of its right to modify the health insurance provided to underline(current employees). Moen contends that some right to modify current employee health insurance suggests it retained a right to modify retiree health insurance.

Long ago, a prosecutor known to the writer (a prosecutor who later became a state court of appeals judge) would often close his prosecutions with the observation that "the truth runs in a straight line." He wisely suggested that the more convoluted the argument the less likely the argument was true. That guidance continues to be true.

Both parties have moved for summary judgment on the question of whether the retirement healthcare benefits are vested lifetime benefits.[4]  For the reasons that follow, the Court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendant Moen's motion for summary judgment.

### I. Procedural Background

On November 1, 2013, John Gallo, Mary Savage, Theodore Wallace, Thomas Nichols, Donald Weaver, Robert Weitzel, John Girman, and the United Automobile Workers sued Defendant Moen, Inc., seeking to represent a class of Moen retirees who receive retirement healthcare benefits

---

[4]*See* Doc. 51 (Plaintiff's motion for summary judgment); Doc. 52 (Moen's motion for summary judgment).

Case No. 1:13-CV-02440
Gwin, J.

and their eligible family members.[5]  They challenge Moen's plan to terminate their existing retirement healthcare benefits.[6]  Plaintiffs say that Moen's planned termination of healthcare benefits breaches the collective bargaining agreements and plant closing agreement Moen signed with the UAW.[7]  This Court has jurisdiction under § 301 of the Labor Management Relations Act ("LMRA")[8] and under the Employee Retirement Income Security Act ("ERISA") § 502.[9]

On December 5, 2013, this Court granted a preliminary injunction, requiring Moen to continue to provide the retirement healthcare benefits until further notice.[10]

On March 10, 2014, the Court approved the parties joint stipulated class of Plaintiffs as

the Individual Plaintiffs and all Moen healthcare benefits plan participants who (a) retired from the UAW-represented collective bargaining unit at Moen's now closed plant in Elyria, Ohio, together with the retirees' spouses, surviving spouses, and all eligible dependents, and (b) were not members of the settlement class for the case captioned *UAW v. Stanadyne, Inc.*, N.D. Ohio Case No. C-83-1198.[11]

The Court also appointed the named Plaintiffs as class representatives and appointed their attorneys as class counsel.[12]

On April 24, 2014, Plaintiffs and Moen cross-moved for summary judgment.[13]

Plaintiffs say that the language of the collective bargaining agreements and the plant closing agreement unambiguously vested lifetime healthcare benefits for retirees.[14]  Arguing that the

---

[5] Doc. 1.
[6] *Id.*
[7] *Id.*
[8] 29 U.S.C. § 185.
[9] 29 U.S.C. § 1132.
[10] Doc. 22.
[11] Doc. 42 at 4.
[12] *Id.*
[13] Doc. 51 (Plaintiff's motion for summary judgment); Doc. 52 (Moen's motion for summary judgment).
[14] *See* Doc. 51-1 at 19-24.

Case No. 1:13-CV-02440
Gwin, J.

collective bargaining agreements plainly vest the right to health insurance, the Plaintiff say that extrinsic evidence also shows that the parties to the agreements intended to vest lifetime healthcare benefits for the retirees.[15]

Defendant Moen says that the benefits provided in the agreements were limited to the term of those agreements; that Moen reserved the right to terminate the benefits after the agreements lapsed; that extrinsic evidence shows Moen did not intend to vest lifetime benefits; that there was no meeting of the minds between Moen and the UAW on vesting; and that Moen unilaterally altered the benefits, thereby defeating vesting.[16]

After all opposition and reply briefs were filed, on June 6, 2014, the Court held oral argument on the cross-motions for summary judgment.[17]  The cross-motions are now ripe for decision.

## II. Factual Background

The collective bargaining agreements between the UAW and Moen (or its predecessors) have long included provisions for retiree health insurance.  Plaintiffs say the collective bargaining language and the structure of those agreements support its argument that the retirees enjoyed a vested right to health insurance.

In a nutshell, the collective bargaining agreements had separate provisions that dealt with employee health insurance and retiree health insurance.  Under paragraph 125, Moen agreed to "furnish . . . insurance for its employees."[18]  Under that same paragraph, Moen kept "the right to

---

[15]/*Id.*

[16]/*See* Doc. 52 at 17-25.

[17]/Doc. 60 (transcript).

[18]/Doc. 52-18 (2005 collective bargaining agreement) at 33 ¶ 125(1) (emphasis added).

-4-

Case No. 1:13-CV-02440
Gwin, J.

amend, cancel or reinsure the policies or change the underwriters . . . so long as the following benefits are maintained for the life of the Agreement."[19]

The collective bargaining agreements provided retiree health insurance in a separate paragraph.  That paragraph provided retiree health insurance at the cost sharing level existing at the time of retirement.  For example, in paragraph 130 of the 2005 Agreement: "[c]ontinued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents prior to March 1, 1996."[20]  And after March 1, 1996, "future retirees will be covered under the new medical plan.  The co-premium amount for the retirees will be frozen at the co-premium in effect at the time of retirement."[21]

Plaintiffs generally argue that the collective bargaining agreements show that Moen agreed to vest the right to retiree health insurance benefits.  Beyond the agreements, the Plaintiffs claim the parties past bargaining history and past conduct gives even more support to Plaintiffs' claims that retiree health insurance benefits were vested.

In general, Defendant Moen acknowledges that it has always paid the level of retiree health insurance consistent with the benefit levels the retirees received at the time they retired.  And Moen acknowledges that it continued to pay these retiree health benefits even after Moen closed the Elyria plant in 2008 and even after Moen reached a 2008 plant closing agreement with the UAW that ended the collective bargaining agreement and relationship.

Moen however argues that two provisions of the collective bargaining agreements should be interpreted to give it the authority to end retiree health insurance benefits.  Moen says that

---

[19]*Id.* at 33 at ¶ 125(2).
[20]*Id.* at 36 ¶ 130(C).
[21]*Id.* at 36 ¶ 130(D).

Case No. 1:13-CV-02440
Gwin, J.

paragraph 125 of the 2005 collective bargaining agreements gave employee health benefits but also said: "The Company shall have the right to amend, cancel or reinsure the policies or change the underwriters thereof, so long as the following benefits are maintained for the life of this Agreement."[22/]

Moen seems to acknowledge that paragraph 125 only covers employees, not retirees,[23/] but argues that under the paragraph dealing with retirees, paragraph 130(D) "effective March 1, 1996, future retirees will be covered under the new medical plan."[24/]  Moen then argues that since retirees receive benefits under the medical plan and since paragraph 125 gave Moen the power to change medical insurers then Moen had a right to end retiree benefits.  Stated otherwise, Moen says its right to change the medical insurer for employees gives it a right to end the medical benefits for retirees.

Having summarized the factual dispute, the Court now provides a more detailed history of the parties relationship.

In 1961, the Western Division of Standard Screw Company began negotiations on a new collective bargaining agreement with the United Automobile Workers union that represented the workers at its Elyria, Ohio, plant.  Although previous collective bargaining agreements included healthcare coverage for current employees and life insurance coverage for pensioners,[25/] the parties had earlier only agreed then that pensioners would be able to participate in the company's healthcare

---

[22/]*Id.* at 33 ¶ 125(2).

[23/]In its briefs, Moen argues that retirees are employees.  *See* Doc. 52 at 19-20.  But at argument, Moen seemed to back away from that position.  *See* Doc. 60 at 11:2-7 ("THE COURT: To sustain that, you really have to suggest that the term 'employee' means not just employee but also retiree.  MR. BURCHFIELD: Again, Your Honor, I disagree with that.  I don't think our argument depends on that, depends on that.").

[24/]Doc. 52-18 (2005 collective bargaining agreement) at 36 ¶ 130(D).

[25/]*See* Doc. 52-3 (1958 collective bargaining agreement) at 3 ¶ 155 & 4 ¶ 161.  [Note: when citing to collective bargaining agreements, the Court refers to the ECF page number, not the internal document's page number.]

Case No. 1:13-CV-02440
Gwin, J.

coverage at their own expense.[26]

However, in 1961, the parties agreed that the company would provide healthcare coverage to retirees.  In providing retiree health insurance benefits, the employer provided those retiree benefits under a different contract provision than the provision that gave health insurance benefits to current employees.

In the article of the collective bargaining agreement on current employee health insurance,[27] the company agreed

> to furnish the following described insurance for its employes [sic] under a policy or policies to be issued by an insurance company association or medical group as selected by the Company.  The Company shall have the right to amend, cancel or reinsure the policies or change the underwriters thereof, so long as the following benefits are maintained for the life of this Agreement: . . .

> (d)     Blue Cross Comprehensive Steel Plan.[28]

In language that continued in later contracts, paragraph 154 thus provides that Moen's predecessor could change insurance policies so long as the benefits are maintained.

In a practice that continued, the 1961 Agreement used a separate paragraph to provide retiree health insurance.  In that paragraph giving retiree insurance, the company promised that "hospitalization and surgical coverage will be provided without cost to pensioners."[29] The retiree health insurance provision did not include any language giving Moen's predecessor any right to end the retiree health insurance.

From the start, the parties dealt with employee health insurance and retiree health insurance

---

[26]*Id.* at 4 ¶ 161.
[27]The collective bargaining agreements were divided into articles.
[28]Doc. 52-4 (1961 collective bargaining agreement) at 33 ¶ 154.
[29]*Id.* at 34 ¶ 159.

Case No. 1:13-CV-02440
Gwin, J.

in separate provisions of the collective bargaining agreement.  And the agreements included the right to amend the health insurance only in the provision covering current employees.  The agreement did not reserve any right to cancel retiree health insurance.

In 1965, the parties negotiated a new collective bargaining agreement.  In that agreement, the company again promised that "[c]ontinued hospitalization, surgical and medical coverage will be provided without cost to past and future pensioners and their dependents."[30]

The parties also agreed that

[t]he company will pay the monthly premium charge for all insurance provided under this agreement for all employes [sic] and their eligible dependents under the terms of the policy and for all retirees and future retirees . . . and their eligible dependents under the terms of the policy.[31]

The 1968 collective bargaining agreement contained the same provisions on employee and retirement healthcare benefits.[32]  In addition, the company agreed to an increase to retiree benefits to help cover Medicare costs.[33]

In 1971, Stanadyne, a successor to the Standard Screw Company, renegotiated the collective bargaining agreement with the UAW.  The parties kept the terms on retirement healthcare benefits the same as those in the 1968 collective bargaining agreement, except that they increased the payment to help retirees cover Medicare costs.[34]

In 1974, 1976, and 1980, Stanadyne and the UAW included the same language on employee

---

[30]/Doc. 52-5 (1965 collective bargaining agreement) at 187 ¶ 162.

[31]/*Id.* at 188 ¶ 163.

[32]/*See* Doc. 52-6 (1968 collective bargaining agreement) at 188 ¶ 157, 197 ¶ 162, & 198 ¶ 163.

[33]/*Id.* at 197 ¶ 162.

[34]/*See* Doc. 52-7 (1971 collective bargaining agreement) at 30 ¶ 157 & 31 ¶¶ 162-63.

Case No. 1:13-CV-02440
Gwin, J.

and retirement healthcare benefits, although increasing the Medicare payment each time.[35]

During 1983 negotiations, employer Stanadyne proposed a 90/10 retiree health insurance co-payment. The union rejected the proposal and went on strike. After the strike began, Stanadyne unilaterally implemented its 90/10 retiree co-payment proposal.

In addition to striking, the UAW also sued Stanadyne in federal court.[36] In that lawsuit, the UAW sought to stop "[Stanadyne] from terminating . . . hospitalization, surgical and medical coverage."[37] In its complaint, the UAW alleged that the collective bargaining agreements "contain provisions . . . guaranteeing pensioners and their dependents continued hospitalization, surgical and medical coverage for their entire lives."[38]

In August 1983, Stanadyne and the UAW settled the strike and entered into a new collective bargaining agreement. In their 1983 strike settlement agreement, the parties acknowledged that the strike was caused, in part, by their disagreement over whether the retirement healthcare benefits were vested and irrevocable.[39] The strike settlement agreement said the parties would leave the retiree insurance vesting issue for the district court's decision. The settlement agreement provided

> that the present lawsuit in the United States District Court involving insurance premium payments for the existing retirees (as of 2/28/83) shall be determined by the courts. With reference to such suit the parties agree that the decision rendered will determine whether existing retirees (as of 2/28/83) will be included as part of the 90/10% co-payment agreement reached for current employees and future retirees. (March 1, effective date for "future retirees.")  Until the case is decided, existing

---

[35] *See* Doc. 52-8 (1974 collective bargaining agreement) at 40 ¶ 148 & 42 ¶¶ 153-54; Doc. 52-9 (1976 collective bargaining agreement) at 41 ¶ 148 & 43 ¶¶ 153-54; Doc. 52-10 (1980 collective bargaining agreement) at 37-38 ¶ 146 & 40 ¶¶ 151(3)-(4), 152(A).

[36] *See* Doc. 52-20 at 22-25. The First Amended Complaint is the only complaint from the case in the record. However, the First Amended Complaint is substantially the same as the original complaint. *See id.* at 15 ("Plaintiffs desire to amend the complaint for the purpose of deleting the class action allegations.").

[37] *Id.* at 24.

[38] *Id.* at 23.

[39] *See* Doc. 52-19 (1983 strike settlement agreement) at 3 ¶ 10.

Case No. 1:13-CV-02440
Gwin, J.

retirees (as of 2/28/83) will be included as part of the 90/10% co-payment provision.

If the Union prevails, the Company will reimburse the existing retirees . . . for the 10% portion of any claims paid for the period beginning August 8, 1983.  Following that, existing retirees (as of 2/28/83) will be maintained under the original 100% provision.

If the Company prevails, existing retirees (as of 2/28/83) will continue under the 90/10 provision in the same manner as current employees and future retirees.[40/]

In the lawsuit, the company argued that it could stop paying one hundred percent the cost of the retirement healthcare benefits and instead require the retirees to pay at least ten percent of the cost.  The Union disagreed.  And the company and the union agreed to let the federal court decide whether Stanadyne could cut past retirees health insurance.

Although the lawsuit was not yet decided, Stanadyne and the UAW entered into a new collective bargaining agreement in August 1983 and included the exact same employee and retiree healthcare provisions as the previous collective bargaining agreements, including the guarantee that retirees would receive health insurance "without cost."[41/]

And although the federal lawsuit remained pending without decision, Stanadyne and the UAW entered into new collective bargaining agreements in 1985 and 1987 that also contained the same provisions, including the "without cost" guarantee.[42/]

In 1991, Defendant Moen had succeeded Stanadyne as the operator of the Elyria plant.  After Moen took the plant over, Moen and the UAW settled the federal litigation over retirement

---

[40/]*Id.*

[41/]*See* Doc. 52-11 (1983 collective bargaining agreement) at 40 ¶ 146 & 42 ¶¶ 151(3)-(4), 152(A).

[42/]*See* Doc. 52-12 (1985 collective bargaining agreement) at 75 ¶ 146 & 79 ¶¶ 151(3)-(4), 152(A); Doc. 52-13 (1987 collective bargaining agreement) at 76-77 ¶ 146 & 81 ¶¶ 151(3)-(4), 152(A).

Case No. 1:13-CV-02440
Gwin, J.

healthcare benefits.[43]

In that settlement, Moen almost completely accepted the UAW's position.  Moen agreed to pay all future retiree health insurance cost and Moen agreed to pay $191,000 to the UAW to compensate retirees for the healthcare costs they paid during the pendency of the litigation.[44]  Moen also agreed to pay for

> coverage . . . for [healthcare] benefits for all Moen Retirees . . . on the same basis as was in existence [before the litigation] through Stanadyne, Inc., including dependent coverage, except that Moen Incorporated agrees to provide such coverage for as long as any Moen Retiree (as defined) is receiving monthly Pension (as defined) payment under the Moen Incorporated Elyria Plants Pension Plan.[45]

In other words, Moen agreed to give the pre-1983 retirees healthcare without cost, as described in the collective bargaining agreements, for the rest of their lives or until Moen ceased to exist.

But the UAW agreed that

> the consideration given to them hereunder does not constitute an admission on the part of Stanadyne Etc., in any claim advanced or which could have been advanced based on events prior to the date hereof in connection with the Lawsuit.  Liability therein of any and all persons and/or corporations released hereby is expressly denied by Stanadyne, Etc. and is agreed to and acknowledged by UAW, Etc.[46]

In addition to settling the federal litigation, Moen and the UAW negotiated a new collective bargaining agreement in 1991.  In that agreement, Moen again dealt with employee health insurance benefits in a different provision than the provision providing retiree health insurance benefits.  Once again, the provision providing employees hospitalization, medical, surgical, and drug benefits gave Moen the right to change insurers so long as the benefits were maintained for the life of the

---

[43]/The parties tentatively settled in 1991, but did not complete the final paperwork until 1992.

[44]/Doc. 52-20 (federal litigation settlement agreement) at 5-7 ¶ 2.2(A).

[45]/*Id.* at 7 ¶ 2.2(B)(1).

[46]/*Id.* at 10 ¶ 3.3

-11-

Case No. 1:13-CV-02440
Gwin, J.

agreement, similar to the prior collective bargaining agreements.[47]  Unlike previous agreements, the

1991 agreement said employees—but not past retirees—would be responsible for a front-end

deductible, twenty percent of the costs subject to a maximum amount for individuals and families,

prescription drug copays, and monthly co-premiums.[48]

     With respect to retirees, the 1991 agreement with Moen said "past pensioners and their

dependents" would continue to receive healthcare coverage "without cost."[49]  But "future retirees"

who retired after March 1, 1993, would have to pay a monthly co-premium to participate in the

company's new medical plan.[50]  The co-premium was "frozen" at the following rates:

**Future Retiree Co-Premiums:**

|  | 1991 | 1992 | 3/1/93 | 3/1/94 | 3/1/95 |
|---|---|---|---|---|---|
| Employee | $0.00 | $0.00 | $2.50 | $5.00 | $7.50 |
| Employee +1 | $0.00 | $0.00 | $5.00 | $10.00 | $15.00 |
| Employee +2 | $0.00 | $0.00 | $5.00 | $10.00 | $15.00[51] |

     Moen agreed to pay the monthly premium charges "for all employees and eligible

dependents under the terms of the policies and for all retirees and future retirees . . . and their

eligible dependents under the terms of the policy."[52]

     The 1991 negotiations with Moen were transcribed.  During those negotiations, a union

negotiator asked the company representative a specific question on whether insurance benefits were

vested:

POHORENCE (union negotiator):   I think I understand future retirees.  But if John Gallo retires
            under this new agreement, he'll pay $10 per month for the

---

[47]/Doc. 52-14 (1991 collective bargaining agreement) at 70-72 ¶ 146(B)(4).

[48]/*Id.*

[49]/*Id.* at 76 ¶ 151(C).

[50]/*Id.* at 76 ¶ 151(D).

[51]/*Id.*

[52]/*Id.* at 76 ¶¶ 151(E), 152(A).

-12-

Case No. 1:13-CV-02440
Gwin, J.

rest of his life?

BALANT (company representative):        Yes.[53]

The union says that in these 1991 negotiations, Moen agreed the retiree health insurance benefits

were vested and would continue "for the rest of [the employee's] life."

In 1996, Moen and the UAW negotiated a new collective bargaining agreement. This

agreement generally contained the same healthcare provisions as the 1991 agreement.[54] Although

the 1991 agreement had allowed Moen to require retiree health care co-pay cost sharing for

employees retiring after March 1, 1993, the 1996 agreement now said Moen would provide

healthcare coverage "without cost" to those who retired before March 1, 1996, instead of March 1,

1993.[55] The 1996 agreement thus pushed back the date that persons retiring after that date would

pay anything for health insurance.

The 1999, 2002, and 2005 collective bargaining agreements contained the same provisions

on employee and retirement healthcare benefits, only increasing the co-premiums that future retirees

would pay and increasing Moen's Medicare reimbursement rate.[56]

So, as of the last collective bargaining agreement in 2005, Moen covered all of the healthcare

coverage costs and all of the Medicare Part B costs for those who retired before March 1, 1996; paid

all of the healthcare insurance costs under the same plan that Moen had for its current employees

for those who retired after March 1, 1996, except for a co-premium that was set by the collective

---

[53]Doc. 51-27 at 1.

[54]See Doc. 52-15 (1996 collective bargaining agreement) at 34-35 ¶ 126(B)(4) & 37 ¶¶ 131(D), 132(A).

[55]Id. at 37 ¶ 131(C)-(D).

[56]See Doc. 52-16 (1999 collective bargaining agreement) at 36 ¶ 126(B)(4) & 39 ¶¶ 131(C)-(E), 132(A); Doc. 52-17 (2002 collective bargaining agreement) at 33-34 ¶ 125(B)(6) & 36 ¶¶ 130(C)-(E), 131(A); Doc. 52-18 (2005 collective bargaining agreement) at 33-34 ¶ 125(2)(6) & 36 ¶¶ 130(C)-(E), 131(A).

Case No. 1:13-CV-02440
Gwin, J.

bargaining agreement in effect when employees retired; and paid $45.50 for an individual and $91.00 for a couple towards the Medicare Part B costs of those who retired after March 1, 1996.[57]

In 2008, Moen decided to close the Elyria plant. After Moen decided to shut the plant, Moen and the UAW negotiated a plant closing agreement. In the negotiated plant closing agreement, the UAW and Moen agreed that the 2005 - 2008 Collective Bargaining Agreement would end after "all bargaining unit employees cease working at the facility."[58]

In the 2008 plant closing agreement, Moen agreed to provide current employees with healthcare severance coverage based on how long the employee had worked for Moen.[59] For instance, an employee who had worked for more than twenty years received six months of healthcare coverage, while an employee who had worked for between five and nine years received two months of healthcare coverage.[60]

With respect to retiree healthcare coverage, with the plant closure agreement, the UAW and Moen agreed to continue retiree healthcare benefits unchanged even though Moen was ending all insurance for employees. In the plant closure agreement, the UAW and Moen agreed, "Healthcare, Sub and Pension and related benefits shall continue under Article XVII - Insurance and Article XVIII - S.U.B. Pension, etc. for all retirees and spouses as indicated under the Collective Bargaining Agreement."[61] The plant closure agreement—the final agreement terminating the UAW and Moen

---

[57] The 1999, 2002, and 2005 collective bargaining agreements only say that those who retired after March 1999 will be reimbursed for Medicare Part B, but no indication or evidence is in the record that those who retired between March 1996 and March 1999 did not receive a Medicare Part B reimbursement or received a lower Medicare Part B reimbursement.

[58] Doc. 51-34 (2008 plant closing agreement) at 1.

[59] *Id.* at 5.

[60] *Id.*

[61] *Id.* at 6.

Case No. 1:13-CV-02440
Gwin, J.

relationship—said retiree healthcare benefits "shall continue."

After the plant had closed in 2008, Moen continued to provide and to pay for healthcare benefits to retirees, including insurance coverage and Medicare Part B reimbursements.  Moen paid for these retiree health insurance benefits after the 2005 plant closure agreement until March 2013. At that time, Moen told retirees that starting January 1, 2014, it would stop providing healthcare coverage and reimbursements to those retirees eligible for Medicare and that it would require those retirees not eligible for Medicare to pay the entire cost of participating in Moen's employee health insurance plan.[62]

### III. Legal Standards

**A.      Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[63]  The moving party must demonstrate that there is an absence of a genuine dispute as to a material fact entitling it to judgment.[64]  Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[65]  The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[66]  But the Court will view the facts and all reasonable inferences from those facts in favor

---

[62]/*See* Doc. 1-3; Doc. 1-4.
[63]/*Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).
[64]/*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[65]/*See* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[66]/*Matsushita*, 575 U.S. at 586.

-15-

Case No. 1:13-CV-02440
Gwin, J.

of the non-moving party.[67/]

**B.    *Yard-Man* and Retirement Healthcare Benefits**

"[W]hether retiree insurance benefits continue beyond the expiration of [a] collective bargaining agreement depends upon the intent of the parties."[68/]  "Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement."[69/]

"The enforcement and interpretation of collective bargaining agreements . . . is governed by substantive federal law.  However, traditional rules of contractual interpretation are applied as long as their application is consistent with federal labor policies."[70/]

> [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent.  The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.  The court should also interpret each provision in question as part of the integrated whole.  If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.  As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.[71/]

In interpreting collective bargaining agreements, the Supreme Court has also cautioned courts that

> [a] collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts. . . .  In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as

---

[67/]*Thomas v. Cohen*, 453 F.3d 657, 660 (6th Cir. 2006) (quoting *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997)).

[68/]*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).

[69/]*Id.*

[70/]*Id.*

[71/]*Id.* at 1479-80 (citations omitted).

-16-

Case No. 1:13-CV-02440
Gwin, J.

well as the practice, usage and custom pertaining to all such agreements.[72]

If the collective bargaining agreement contains ambiguities,

the court may look to other words and phrases in the collective bargaining agreement
for guidance.  Variations in language used in other durational provisions of the
agreement may, for example, provide inferences of intent useful in clarifying a
provision whose intended duration is ambiguous.  Finally, the court should review
the interpretation ultimately derived from its examination of the language, context
and other indicia of intent for consistency with federal labor policy.[73]

Subsequent cases also indicate that when the collective bargaining agreement is ambiguous,

the Court may also consider extrinsic evidence, or if "the plain language is susceptible to more than

one interpretation."[74]

The Sixth Circuit's *Yard-Man* case also suggests courts can infer more likelihood that labor

contract intend to give vested retiree benefits because "retiree benefits are in a sense 'status

benefits,'" they "carry with them an inference that they continue so long as the prerequisite status

is maintained.  Thus, when the parties contract for benefits which accrue upon achievement of retiree

status, there is an inference that the parties likely intended those benefits to continue as long as the

beneficiary remains a retiree."[75]

Later cases clarify that "the *Yard-Man* inference [is] not a legal presumption that shifted the

burden to the employer to disprove that benefits vested.  Rather, the *Yard-Man* inference simply

requires a nudge in favor of vesting in close CBA [collective bargaining agreement] cases."[76]

---

[72] *Transp.-Comm. Emps. Union v. Union Pac. R..R.*, 385 U.S. 157, 160-61 (1966) (citations omitted).

[73] *Yard-Man*, 716 F.2d at 1480 (citations omitted).

[74] *Moore v. Menasha Corp.*, 690 F.3d 444, 451 (6th Cir. 2012); *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Kelsey-Hayes Co.*, 750 F.3d 546, 551 (6th Cir. 2014).

[75] *Yard-Man*, 716 F.2d at 1482.

[76] *Kelsey-Hayes*, 750 F.3d at 552 (internal quotation marks and citations omitted).

-17-

Case No. 1:13-CV-02440
Gwin, J.

## IV. Analysis

The Court first considers whether the collective bargaining agreements and the plant closing agreement are unambiguous about the vesting of retirement healthcare benefits.  The Court then considers the impact of extrinsic evidence on the question of vesting.  And finally, the Court considers Defendant Moen's additional arguments on the summary plan description and the meeting of the minds.

**A.      Unambiguous Language of Agreements**

Although Plaintiffs and Defendant both say that the language of the collective bargaining agreements and the plant closing agreement is unambiguous, the parties make radically different arguments regarding what the agreements unambiguously say.

The Court first holds that the collective bargaining agreements unambiguously grant vested, lifetime healthcare benefits for retirees.  Second, the collective bargaining agreements' reservation-of-rights language gives Moen the right to change its medical benefits insurer.  It does not give Moen a right to end employee medical benefits.  But more important, the reservation of rights does not give Moen the right to terminate retirement healthcare benefits.  And finally, the plant closing agreement also unambiguously grants vested, lifetime healthcare benefits for retirees.

**1.      Language of the Collective Bargaining Agreements**

Since 1996, the provisions of the collective bargaining agreements between the UAW and Moen and its predecessors have mostly remained the same, although the exact benefits provided have changed over time.  The most recent collective bargaining agreement's provisions on retirement healthcare benefits read as follows:

> Continued hospitalization, surgical and medical coverage will be provided without cost to past pensioners and their dependents prior to March 1, 1996.

-18-

Case No. 1:13-CV-02440
Gwin, J.

> Effective March 1, 1996, future retirees will be covered under the new medical plan. The co-premium amount for the retiree will be frozen at the co-premium in effect at time of retirement. . . .
>
> The Company will pay the monthly premium charge as agreed to for insurance provided under this Agreement for all employees and their eligible dependents under the terms of the policy and for all retirees and future retirees . . . and their eligible dependents under the terms of the policy.[77]

In 2008, Moen closed the Elyria plant and negotiated a closure agreement to finalize all issues with the UAW.[78] That closure agreement established a specific time line for ending <u>employee</u> health insurance. Then-current employees with greater than twenty years of active service received six months of continued health insurance.[79] Employees with five to nine years of active service received only two months of continued health insurance.[80]

Significantly, with this plant closure agreement Moen gave an open-ended commitment to continue paying retiree health insurance: "Healthcare . . . and related benefits shall continue . . . for all retirees and spouses as indicated under the Collective Bargaining Agreement."[81]

In the recent *Kelsey-Hayes* case, the Sixth Circuit considered a collective bargaining agreement that promised,

> The Company *shall contribute* the full premium or subscription charge for health care coverages *continued* in accordance with Article III, Section 5, for:
>
> (I)    A retired employee and his eligible dependents, if any, provided such retired employee is eligible for benefits under [the pension plan]

---

[77]/Doc. 52-18 (2005 collective bargaining agreement) at 36 ¶¶ 130(C)-(E), 131(A).

[78]/Doc. 51-34 (2008 plant closing agreement) ("This instrument shall serve as the complete agreement and understanding between Moen, Incorporated Elyria Facility, . . . and . . . the "Union" relative to the plant closing agreement.")

[79]/*Id.* at 5.

[80]/*Id.*

[81]/*Id.* at 6.

Case No. 1:13-CV-02440
Gwin, J.

> (ii)    An employee and his eligible dependents, if any, terminating at age 65 or older for any reason other than a discharge for cause with insufficient credited service to entitle him to a benefit under [the pension plan].
>
> The Company *shall contribute* the full premium or subscription charge for healthcare coverages *continued* in accordance with Article III, Section 6(b) on behalf of a surviving spouse . . . and the eligible dependents of any such spouse. . . .
>
> The health care coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older for any reason other than a discharge for cause . . . *shall be continued* thereafter provided that suitable arrangements for such continuation[] can be made with the carrier(s). Contributions for such coverages so continued shall be made in accordance with Article I, Section 3(b)(7).[82]

The Sixth Circuit found "this language unambiguous and [held] that this CBA language alone, when construed in light of the *Yard-Man* inference, created a vested lifetime right to health care benefits."[83]

Because Moen and the UAW used similar language—"continued" benefits or a "continuance" of benefits that "will" be provided—and in light of the *Yard-Man* inference, the Court holds that the language of the collective bargaining agreements unambiguously created vested lifetime rights to healthcare benefits.

Because the Court must also look to "the scope of other related collective bargaining agreements, as well as the practice, usage and custom" of those agreements,[84] the Court confirms this finding by looking to the history of the retirement healthcare benefits in the collective bargaining agreements.

From 1965 on, the UAW and Moen and its predecessors never decreased the healthcare

---

[82] 750 F.3d at 549 (emphasis added).

[83] *Id.* at *7.

[84] *Transp.-Comm. Emps. Union.*, 385 U.S. at 161.

Case No. 1:13-CV-02440
Gwin, J.

benefits for past retirees; they only increased them. This left retirement healthcare benefits that mirrored the benefits provided to employees at the time the employee retired. And once retired, the retiree healthcare benefits were not reduced even though active employees' benefits were reduced in subsequent collective bargaining agreements. For those who retired before 1996, Moen paid all of their healthcare costs; for those who retired after 1996, Moen paid an ever decreasing amount for their healthcare coverage, depending on the year they retired.

When the UAW and Moen did not decrease the healthcare benefits given to past retirees, it suggests the parties considered those benefits vested. Most employers focus on total labor cost. Money paid towards retiree benefits reduces money available for current employee wages and benefits. And neither the UAW or Moen had a duty to bargain on behalf of the past retirees.[85] Unless retiree benefits were vested, both the UAW and Moen had every incentive to reduce retiree benefits to give higher wages and benefits to current employees, the actual union members. And unless retiree benefits were vested, both the UAW and Moen had no incentive to give the highest retiree benefits to employees who left employment more than ten years before Moen closed the Elyria plant in 2008.

"[A]s the exclusive bargaining representative of the employees in [a] bargaining unit, the Union ha[s] a statutory duty fairly to represent all of those employees."[86] Therefore, the union cannot act in an arbitrary or discriminatory manner.[87]

Here, the past retirees were not members of the collective bargaining unit, and the UAW did

---

[85] *See Yard-Man*, 716 F.2d at 1484 ("[E]mployers are under no obligation to bargain with unions over benefits for already retired workers. . . . As such, benefits for retired workers are not a mandatory but rather only a permissive subject of collective bargaining. Similarly, the union has no duty to represent retirees with thee mployer, although it may choose to do so.").

[86] *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

[87] *Id.* at 207.

-21-

Case No. 1:13-CV-02440
Gwin, J.[88/]

not represent them during the bargaining.[88/]

To assume that the UAW would continuously secure better benefits for past retirees—that the union did not represent—at the expense of benefits for its current members *and* would continuously discriminate between past retirees in terms of benefits—preferring those who retired the longest ago—is illogic.

Rather, the language of the collective bargaining agreements, with its history of providing the same benefits to retirees while reducing current employees' benefits, unambiguously vested the healthcare benefits Moen provided to retirees.

Moen brings two additional arguments against vesting: 1) if the benefits were vested, the language concerning those benefits in subsequent collective bargaining agreements would be superfluous; and 2) the "continued" language means that Moen agreed to continue the benefits from contract to contract.  The Court addresses each argument in turn.

Moen's argument on the "superfluous" language fails.  The collective bargaining agreements appear to have been copied verbatim from year to year with only minor changes of certain specific values.[89/]  Therefore, the inclusion of those provisions on past retirees benefits was the custom of the parties, not surplusage.

Additionally, Moen's argument that "continued" means carried over from contract to

---

[88/]Defendant Moen contends that the UAW did represent the retirees.  Doc. 56 at 14.  Moen's only evidence for this is 1) the fact that the UAW represented retirees in the *Stanadyne* litigation from 1983-1991 and 2) the fact that the collective bargaining agreements contain retirement benefits.  *Id.*  This is belied by the fact that Moen "recognize[d]] the Union as the exclusive bargaining agency for the purpose of collective bargaining on all matters pertaining to wages, hours and other conditions of employment, as provided herein, of all *employees in this unit in its plant* located Elyria, Ohio."  Doc. 52-18 (2005 collective bargaining agreement) at 5 ¶ 2.  The UAW did not purport to represent past retirees during the bargaining.

[89/]*Compare* Doc. 52-16 (1999 collective bargaining agreement) at 36 ¶ 126(B) (omitting subparagraphs (1) and (2) before (3)), *with* Doc. 52-18 (2005 collective bargaining agreement) at 33 ¶ 125(B) (making same numbering error).

Case No. 1:13-CV-02440
Gwin, J.

contract fails.  The parties used "continued" to describe the future benefits Moen would provide to

*future* retirees.[90/]  These benefits were not "continued" from a previous collective bargaining

agreement because they were never previously paid: you cannot continue something until it has

begun.

Thus, in the parties' agreements, the benefits were "continued" in the sense that the retirees

received the benefits while employees and they would "continue" to receive them after retirement.

And as described by the Sixth Circuit in *Kelsey-Hayes*, that language unambiguously indicates that

the benefits were vested.

### 2.    Reservation of Rights

In each relevant collective bargaining agreement, Moen agreed

> to furnish the following described insurance for its employees under a policy or
> policies to be issued by an insurance company association or medical group as
> selected by the Company.  The Company shall have the right to amend, cancel or
> reinsure the policies or change the underwriters thereof, so long as the following
> benefits are maintained for the life of this Agreement:
>
> [Life insurance, accidental death and dismemberment insurance, sickness and
> accident weekly benefits, pension, 401K, and] Hospitalization, Medical, Surgical &
> Drug Benefits.[91/]

Although this reservation of rights language appears in the paragraph describing employee,

not retiree, benefits, Moen says the language entitles it to cancel retirement healthcare benefits.

Moen argues: 1) retirees are "employees," and so the reservation of rights policy applies to retirees;

and 2) retirees receive healthcare coverage under the same policies as employees, and so Moen's

right to terminate the policies applies to both employees' and retirees' healthcare coverage.

---

[90/]*See, e.g.*, Doc. 52-14 (1991 collective bargaining agreement) at 75 ¶ 151(A) ("Continued Life Insurance will
be provided without cost to *future* pensioners . . . . (emphasis added))

[91/]Doc. 52-18 (2005 collective bargaining agreement) at 33 ¶ 125(2).

-23-

Case No. 1:13-CV-02440
Gwin, J.

The Court rejects these arguments.

The collective bargaining agreement language that Moen relies upon does not support the argument, even if it somehow applied to retirees.

Moen relies upon paragraph 125 of the 2005 Agreement.  That provision says:

> The Company agrees to furnish the following described insurance for its employees under a policy or policies to be issued by insurance company association or medical group as selected by the Company.  The Company shall have the right to amend, cancel or reinsure the policies or change the underwriters thereof, so long as the following benefits are maintained for the life of this Agreement.[92]

This unexceptional language gives Moen the right to pick the health insurance provider and gives Moen the right to change that insurance provider.  Paragraph 125 cannot be interpreted to allow Moen to cancel coverage.  While Moen can choose the insurance provider—with the attendant right to cancel one insurance policy in favor of another—Moen must continue the benefits provided under its collective bargaining agreements.

With respect to Moen's argument that retirees are employees, the evidence for saying that retirees are employees is extrinsic: the deposition testimony of three of the UAW negotiators.[93] Plaintiffs contest this characterization of the testimony, but that is irrelevant.

The term "employee" is undefined in the collective bargaining agreements.  Using "traditional rules of contractual interpretation,"[94] the Court notes that

> [t]he fact that the parties fail to specifically define a term within the contract does not make the term ambiguous.  Instead, common, undefined words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the

---

[92] *Id.*
[93] *See* Doc. 52 at 19-20.
[94] *Yard-Man*, 716 F.2d at 1479.

Case No. 1:13-CV-02440
Gwin, J.

instrument.[95]

Traditional rules of contractual interpretation also say that "the term 'employee' . . . does have a plain and ordinary meaning.  It is, therefore, unnecessary and impermissible for a court to resort to construction of that language."[96]  That plain meaning is "'[a] person in the service of another * * *, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed. * * * One who works for an employer; a person working for salary or wages.'"[97]  In other words, an employee is unambiguously not a retiree.

And in any event, here, the parties have made clear in the contract that the term "employee" unambiguously does not refer to retirees.

First, the parties use "employee" and "retirees" disjunctively in the same paragraph.  That use shows that an "employee" is not a "retiree." The agreements say that Moen will pay the monthly premium charge for insurance provided under the agreement "for all employees . . . and for all retirees and future retirees."[98]  Moen's use requires a finding that "employee" is not a "retiree."

And second, the parties required "all Company employees" to participate in a drug and alcohol testing program if their "appearance and/or conduct indicate an unusual or erratic circumstance."[99]  Moen says that this requirement "applies *by its terms* only to active employees."[100]  However, the agreement says "all Company employees."  Moen cannot consistently say that "employees" includes retirees and also say that retirees were not required to participate in the drug

---

[95] *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004) (citation and internal quotation marks omitted).

[96] *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995).

[97] *Id.* at 686-87 (quoting *Black's Law Dictionary* 525 (6th ed. 1990)) (alteration in original).

[98] Doc. 52-18 (2005 collective bargaining agreement) at 36 ¶ 131(A).

[99] *Id.* at 38 ¶ 135(II).

[100] Doc. 56 at 13 (emphasis in original).

-25-

Case No. 1:13-CV-02440
Gwin, J.

and alcohol testing program.  This shows that "employees" are limited to active employees, not retirees.

Moen's next argument—that it reserved the right to cancel all healthcare policies after the termination of the collective bargaining agreement—also loses.

The reservation of rights language applies to the policies that Moen provides for its *employees*, not to *retirees*.  The parties treated the insurance provided to employees and the insurance provided to retirees differently, even if they were enrolled in the same plans.  In the last paragraph of the insurance article, Moen agreed to pay the monthly premium "for employees and their eligible dependents under the terms of the policy and for retirees and future retirees . . . and their eligible dependents under the terms of the policy."[101]

By treating retirement healthcare benefits separately from employee insurance benefits, the parties demonstrated an intent that the benefits were not all of one kind.[102]  Because they are treated differently, even if the reservation of rights language had given some right to cancel employee health insurance, it does not give Moen the right to terminate the retirement healthcare benefits.

Moen's reliance on *Witmer v. Acument Global Technologies, Inc.* is wrong.  In *Witmer*, the defendant company had included a reservation of rights language *in the pension plan itself*, immediately proceeding the description of what retirement benefits the plan would provide.[103]  And importantly, the *Witmer* pension language—in contrast to Moen's reservation language only giving

---

[101]Doc. 52-18 (2005 collective bargaining agreement) at 36 ¶ 131(A).

[102]Indeed, the collective bargaining agreements did not even say that all retirees would be members of the new health insurance plan.  Only future retirees as of March 1, 1996, "will be covered under the new medical plan."  *Id.* at 36 ¶ 130(D).

[103]694 F.3d 774, 778 (6th Cir. 2012) (appendix to majority opinion).

-26-

Case No. 1:13-CV-02440
Gwin, J.

Moen a right to change insurance carriers—reserved the right "to . . . terminate the Plan."[104/]

But here, the parties used the reservation clause only in the employee benefits and did not include any reservation language with retirement healthcare benefits.

Therefore, Moen did not reserve the right to terminate retirement healthcare benefits after the collective bargaining agreements expired.

### 3.  2008 Plant Closing Agreement

Even clearer, the 2008 plant closing agreement also unambiguously vests lifetime health benefits.  In that agreement, the UAW and Moen agreed, "Healthcare . . . and related benefits shall continue   . . .  for all retirees and spouses as indicated under the Collective Bargaining Agreement."[105/]

Like the language in *Kelsey-Hayes*,[106/] in light of the *Yard-Man* inference, this language also unambiguously vests retirement healthcare benefits.

First, the agreement promises that benefits "shall continue" for retirees, without an end date. "[W]hen the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree."[107/]

Second, the plant closure agreement had placed set time limits on employee benefits.[108/]  It had no similar time limit for retiree benefits.  Therefore, if the parties had intended to place time limits on the retirement healthcare benefits, they knew how to do so.  And they did not.

---

[104/]*Id*.
[105/]Doc. 51-34 (2008 plant closing agreement) at 6.
[106/]750 F.3d at 549.
[107/]*Yard-Man*, 716 F.2d at 1482.
[108/]Doc. 51-34 (2008 plant closing agreement) at 5.

Case No. 1:13-CV-02440
Gwin, J.

In the plant closing agreement, the UAW and Moen agreed that the retirement benefits "shall continue." Because the Court must read no terms "nugatory" when possible,[109] the Court must read that additional language as creating an additional promise beyond any already contained in the plant closing agreement.

But if Moen is correct, and the collective bargaining agreements did not vest the benefits, then this additional promise that the benefits "shall continue" must be read to mean something more than that the benefits would continue until the plant closed, because the closing agreement already promised that.

Therefore, even if the collective bargaining agreements had not vested the benefits, the plant closing agreement unambiguously vested the retirement healthcare benefits.

## B.     Extrinsic Evidence

The collective bargaining agreements and the plant closure agreements show an intent to vest retirees with a right to health insurance. Extrinsic evidence is unnecessary. But if extrinsic evidence were considered, it also shows the parties intent to vest the right to retiree health insurance benefits.

First, Moen has paid unreduced retiree health care benefits for six years after Moen closed the Elyria plant and terminated its collective bargaining relationship with the UAW. Unless Moen believed it was obligated to continue the retiree health insurance, why would Moen pay the significant cost for the retiree health insurance? Unless it believed it was contractually obligated, why would Moen use shareholder money to provide a benefit to retirees from a defunct facility who left employment twenty or thirty years before? The answer is simple: Moen would not.

Moen continued to provide healthcare coverage to retirees between 2008 and 2013, even

---

[109] *Yard-Man*, 716 F.2d at 1479-80 (citations omitted).

Case No. 1:13-CV-02440
Gwin, J.

though it says it did not have to do so.  The fact that Moen continued to provide benefits, even

though it now says it did not have to, is evidence that Moen understood the benefits were vested.[110/]

Most of the evidence submitted by the parties is ambiguous, constitutes their subjective

beliefs about the benefits, or is contested conversations about benefits after the time the employees

retired.[111/]

One additional piece of uncontested extrinsic evidence proves that show the intent of the

parties was provide lifetime benefits.

During the 1991 negotiations, Defendant Moen's representative told the UAW that future

retirees would only need to pay the co-premium set in the agreement and they would be covered for

life.[112/]

Because the remainder of the extrinsic evidence concerns subjective understandings and

conversations outside the bargaining negotiations, that evidence is inferior to the uncontested

evidence of the bargaining statement and Moen's post-closing conduct.[113/]

Accordingly, even assuming the language is ambiguous, the Court finds no genuine dispute

exists about the parties' intent to vest the benefits, and would grant summary judgment to Plaintiffs.

---

[110/]*See* *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Skinner Engine Co.,* 188 F.3d 130, 144 (3d Cir. 1999).  Defendant cites *Weimer v. Kurz-Kasch, Inc.,* 773 F.2d 669 (6th Cir. 1985), for the proposition that "an employer's decision to provide benefits for longer than required is not evidence of vesting." Doc. 54 at 21.  In *Weimer*, the defendant corporation similarly continued to provide benefits after the expiration of a collective bargaining agreement and later said it could have terminated the benefits immediately.  188 F.3d at 670-71.  The Sixth Circuit held that the agreements unambiguously vested benefits and so it did not need to consider extrinsic evidence; but "We point out, however, that if it were necessary, in determining the intent of the parties, to rely on facts *dehors* the contracts, the fact that retirees' insurance benefits initially were continued after the collective bargaining agreements expired and the stated reason they were discontinued *would be some evidence of the parties' intent*." *Id.* at 676 n.6 (emphasis added).

[111/]*See* Doc. 51-1 at 23-24; Doc. 54 at 17-23.

[112/]Doc. 51-27 at 1.  Moen's only response to this statement is that the Court need not consider the evidence because the contracts are unambiguous.  Doc. 54 at 19.

[113/]*In re Halishak,* 324 B.R. 641, 644 (Bankr. N.D. Ohio 2005) ("Contractual formation is based on objective standards; not the subjective understanding of the respective parties.").

-29-

Case No. 1:13-CV-02440
Gwin, J.

**C.      Moen's Remaining Arguments**

Moen's remaining arguments against vesting—that a pension plan summary plan description made minor changes and the union did not object and that no meeting of the minds on vesting occurred—also lose.

First, on the issue of changes in a summary plan description affecting vesting, the Sixth Circuit has said,

> If an employer includes "unqualified reservation-of-rights language" in an SPD [summary plan description] to the effect that the employer has a "unilateral right . . . to terminate coverage," and if a union fails to grieve or object to such language, then such reservation-of-rights language "prevent[s] retiree benefits from vesting" even if the SPD was distributed after the effective date of the CBA.[114]

Here, Moen relies on minor changes to the summary plan description regarding the substantive benefits provided, not Moen's rights to terminate the benefits.  The summary plan description from 1996—the only one Moen provided in its motion for summary judgment—changed the percentage of costs a retiree or employee would pay if she used an out-of-network provider and allowed for lifetime caps for certain coverages.[115]  This summary plan description required retirees and employees to pay a higher percentage than the collective bargaining agreements required.[116]

Notably, the summary plan description did not reserve Moen's right to terminate the benefits. And because of that, Moen's reliance on *Maurer v. Joy Technologies, Inc.* is wrong.  In *Maurer*, the

---

[114]/*Reese v. CNH Am. LLC*, 574 F.3d 315, 323 (6th Cir. 2009).

[115]/Doc. 52-21 at 5-6.

[116]/Doc. 52-15 (1996 agreement) at ¶ 126(B)(4).  They also provided some benefits that were better than the collective bargaining agreements provided: under the summary plan description, the coinsurance limit was $400 for a single person and $800 for a family; the deductible was $100 for a single person and $200 for a family.  Doc. 52-21 at 4.  Under the collective bargaining agreements, the UAW and Moen agreed that "employees will be under a 80/20 co-payment program with maximum employee contributions of $500 single/$1,250 family, including the front end deductible."  Doc. 52-15 (1996 agreement) at ¶ 126(B)(4).

Case No. 1:13-CV-02440
Gwin, J.

summary plan description included a reservation of rights provision.[117]  Because that did not occur here, Moen's argument fails.

At best, Moen has shown that it had the right to enroll the retirees in an insurance plan reasonably close to the benefits provided for by the collective bargaining agreements.[118]

And second, Moen's argument that no meeting of the minds occurred here also fails.  Under traditional principles of contract interpretation, the law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape simply by contending that it did not understand them at the time.  What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous.[119]

Here, the Court has found that the contract was unambiguous, and so an objective meeting of the minds occurred.

But even if the contract was ambiguous, Moen provided signals that it believed the benefits were vested: it continued to provide the benefits after the plant closed and it told union negotiators that the retirees would receive healthcare benefits for the rest of their lives as long as they paid the co-premiums.

Accordingly, the Court finds that the benefits were vested.

### V. Permanent Injunction

In addition to seeking a declaration that the benefits are vested, Plaintiff seeks a permanent

---

[117]/212 F.3d 907, 919 (6th Cir. 2000).

[118]/See *Reese*, 574 F.3d at 327 (finding that later changes to benefits in collective bargaining agreements, extrinsic evidence, and common sense show that the parties agreed that benefits could be reasonably altered).

[119]/*216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008).

Case No. 1:13-CV-02440
Gwin, J.

injunction requiring Moen to continue the retirement healthcare benefits during the lifetime of the class members.[120/] However, they do not address the factors the Court must consider in determining whether an injunction should issue.

Nevertheless, because the parties already provided evidence and argument on many of the factors, and in the interests of bringing this case to a swift resolution, the Court will consider whether an injunction should issue.

To be entitled to a permanent injunction, once success on the merits is established, a plaintiff must show (1) that she has suffered irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that a remedy in equity is warranted considering the balance of hardships between plaintiff and defendant; and (4) that the public interest "would not be disserved by a permanent injunction."[121/]

First and second, Plaintiffs have previously demonstrated show that the class will suffer irreparable injury and that remedies at law are inadequate to compensate for that injury.

After the preliminary injunction hearing, this Court found that "[t]he dramatic rise in [the plaintiffs'] healthcare costs—in terms of cost of new coverage, loss of medicare premium assistance, and increased deductibles and co-payments—will destroy their limited incomes."[122/] Further, Moen's contention that Medicaid coverage may be available to class members did not persuade the Court because "in order to qualify for Medicaid, there are eligibility requirements that may force a class member to sell property."[123/] Therefore, the Court held that Plaintiffs were "likely to suffer

---

[120/]Doc. 51 at 1-2.
[121/]*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).
[122/]Doc. 29 at 12.
[123/]*Id.* at 12.

-32-

Case No. 1:13-CV-02440
Gwin, J.

certain and immediate injury."[124]  This evidence has not changed.

The Sixth Circuit has noted that "even relatively small increase in [] expenses" can result in extreme hardship to retirees given their fixed incomes.[125]  This is because "retirees as a group have less resources and are more vulnerable to emotional distress due to the imposition of additional insurance costs."[126]

In this case, the Court heard credible evidence that at least some of the class members' insurance premiums will nearly double if Moen terminates coverage.[127]  "Ultimately, compensating plaintiffs monetarily will not remedy the breaches of the [collective bargaining agreements—rather, the appropriate remedy is to require defendants to do what they agreed to do."[128]

Third, the Court finds that the balance of hardships also weighs in favor of granting the injunction.

A permanent injunction simply requires "performance consistent with the plain text of the CBA; indeed, by its very terms, the injunction simply requires a return to the status quo ante."[129] Moen will be required to continue to provide insurance coverage for retirees as the collective bargaining agreements and plant closing agreements require, and as it has done since the closing of the plant in 2008.  Therefore, the Court finds that the balance of the hardships favors an injunction.

And finally, the public interest will not be disserved by granting the permanent injunction. Denial of an injunction would create a barrier to the class members' access to healthcare given their

---

[124]*Id.*

[125]*Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996) (affirming the district court's finding of irreparable harm and its imposition of an injunction).

[126]*Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 415 (E.D. Mich. 1994).

[127]Doc. 29 at 12.

[128]*Kelsey-Hayes*, 750 F.3d at 559.

[129]*Id.*

-33-

Case No. 1:13-CV-02440
Gwin, J.

financial constraints.  Our society also has an interest in ensuring that parties to collective bargaining agreements abide by the clear and unambiguous terms of the agreements.

Therefore, the Court concludes that a permanent injunction is appropriate.

### VI. Conclusion

For these reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment and **DENIES** Defendant Moen's motion for summary judgment.

The Court **DECLARES** that the retirement healthcare benefits described in the collective bargaining agreements and the plant closing agreement between the UAW and Moen are lifetime, vested benefits.

The Court further **PERMANENTLY ENJOINS** Defendant Moen from terminating the retirement healthcare benefits for each class member described in the collective bargaining agreements and the plant closing agreement during his lifetime, for retirees and their spouses, and while he remains an eligible dependent.

Moen has also moved to strike Plaintiffs' jury demand.[130]  In light of this order, that motion is moot, and the Court **DENIES** the motion without prejudice.

IT IS SO ORDERED.


Dated: June 23, 2014                                     s/          *James S. Gwin*
                                                         JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE

---

[130] Doc. 57.

-34-